IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALFRED RUSSELL MARTIN,<br>     *Plaintiff*, | § § § § | |
| v. | § § | Civil Action No. |
| CENTRAL TRANSPORT, LLC,<br>     *Defendant*. | § § § § § | |

**COMPLAINT**

Plaintiff Alfred Russell Martin ("Martin") brings this action against his former employer, Defendant Central Transport, LLC ("Central Transport"). As shown below, Central Transport has committed at least three unlawful employment practices.

**STATEMENT OF THE CASE:**
**This is an Employment Discrimination (Race) -- Retaliation Case.**
**It Involves Two Nooses and Central Transport's Decision to Discharge Martin.**

1. On two separate occasions – they were about five weeks apart -- Central Transport had a noose at one of its workplaces.

 A. On both occasions, the Central Transport employee who made and erected the noose had the word "Supervisor" in his job title.

 B. On both occasions, the Central Transport employee who made and erected the noose was not black.

2. Perceiving that the two nooses were racist symbols, Martin went to management to oppose the presence of the nooses and what he perceived to be management's less than adequate response.

3. Central Transport discharged Martin about two-and-one-half months after Martin's

opposition referenced in paragraph 2 *supra*.

4. When Central Transport informed Martin of its discharge decision, it was still employing the two "Supervisors" referenced in paragraph 1.A and B, *supra.*

5. Martin's three claims for relief all allege that Central Transport violated the part of the Civil Rights Act of 1866 codified at 42 U.S.C. § 1981 ("Section 1981").

## Parties

6. Alfred Russell Martin is an individual. He resides in Mansfield, Texas.

　　A. Matin resided in Mansfield, Texas throughout all of calendar year 2022.

7. Central Transport, LLC ("Central Transport") is a corporation organized in and existing under the laws of the State of Michigan. Its headquarters is located at 12225 Stephens Road in Warren, Michigan 48089-2070.

　　A. Central Transport may be served with process by serving its **registered agent**, **Cogency Global Inc.**, located at **1601 Elm Street, Suite 4360, Dallas, Texas 75201**, or wherever else it may be found.

## Jurisdiction

8. This Court has subject matter jurisdiction over this action because Martin's claims all present federal questions. *See* 28 U.S.C. §1331; *see also* 28 U.S.C. § 1343(a)(4) ("civil rights").

9. This Court has personal jurisdiction, both specific and general, over Central Transport because Central Transport conducts business in Texas, Martin's claims arose in Texas, and Central Transport is amenable to service by this Court.

## Venue

10. Venue is proper in this judicial district and division because a substantial part of the events or omissions giving rise to Martin's claims occurred here. *See* 28 U.S.C. § 1391(b)(2).

## Material Facts

11. Central Transport provides transportation services.

12. Central Transport offers cross-docking, truck loading, and supply chain services.

13. Central Transport employs between one thousand nine hundred and two thousand people.

14. Central Transport serves customers in the United States, Canada, and Mexico.

15. Central Transport operates a facility located at 4500 Irving Boulevard in Dallas, Dallas County, Texas (hereinafter "Irving Terminal").

16. Central Transport operated the Irving Terminal throughout all of calendar year 2022.

17. Martin's race is black.

18. Martin's race is black according to Central Transport's records.

19. Central Transport hired Martin in September 2015.

20. Central Transport hired Martin on September 15, 2015.

21. Central Transport hired Martin to work as a "City Driver."

22. Central Transport hired Martin to work full-time.

23. Central Transport paid Martin by the hour.

24. Central Transport assigned Martin to its Irving Terminal.

25. In August, September and October of 2022, Central Transport had Martin report to work at the Irving Terminal at six o'clock in the morning.

26. On the shifts where Martin worked at the Irving Terminal in August, September and October of 2022, Central Transport employed about fifty drivers other than Martin.

27. On the shifts where Martin worked at the Irving Terminal in August, September

and October of 2022, at least one third of Central Transport's drivers assigned to the Irving Terminal were black.

*FIRST NOOSE INCIDENT & ITS AFTERMATH*

28. On Friday, August 12, 2022, a noose was discovered at the Irving Terminal.

29. On Friday, August 12, 2022, a noose was discovered at the loading dock of the Irving Terminal.

30. On Friday, August 12, 2022, one of the dockworkers discovered a noose at the loading dock of the Irving Terminal.

31. On Friday, August 12, 2022, a dockworker whose race is black discovered a noose at the loading dock of the Irving Terminal.

32. On Friday, August 12, 2022, Martin saw this same noose with his own eyes.

33. Martin spoke with Central Transport's Terminal Manager, Mr. Gerardo Enriquez, about this noose.

    A.    Martin told Enriquez that having a noose at the Irving Terminal was "*fucked up*."

    B.    Martin then asked Enriquez what was going to happen to the noose.

    C.    Enriquez responded, "*We will take care of it*."

        (i)    Enriquez did not elaborate.

*SECOND NOOSE INCIDENT & ITS AFTERMATH*

34. On Monday, September 19, 2022, another Dock Supervisor – his name is James Hall, and his race is not black – made a noose. He then put that noose around a brown-colored dummy. After that, Hall hanged the dummy at or near the ceiling by the Dock Supervisor's station of the Irving Terminal.

**Complaint**        **Page 4**

  A. Several black drivers watched Hall do this.

    (i) One of those drivers was Martin.

*CENTRAL TRANSPORT'S DISCHARGE OF MARTIN & ITS AFTERMATH*

 35. On Tuesday, October 4, 2022, after Martin made a delivery to an entity called "AER," Central Transport reached out to Martin and instructed him return to the Irving Terminal. Martin complied.

  A. Once at the Irving Terminal, Central Transport, by and through Mr. George Guerra, its Assistant Terminal Manager for the Irving Terminal, instructed Martin go to the following facility – ProActive Work Health Services, located at 3141 Irving Boulevard, Suite 230, Dallas, Texas ("Proactive") – for his Department of Transportation ("DOT") physical.

  B. Martin complied with the instructions set forth in Paragraph 35.A by going to ProActive that same day, at which time a health care provider performed a DOT physical on Martin.

  C. During the DOT physical referenced in subpart "B" of this paragraph, the health care provider who performed the physical at ProActive told Martin that Martin's blood pressure was a "little high."

  D. During the DOT physical referenced in subpart "B" of this paragraph, the health care provider who performed the physical at ProActive told Martin to see his (*i.e.*, Martin's) own doctor.

 36. On Friday, October 7, 2022, Martin complied with the instructions of the health care provider at ProActive during the DOT physical referenced in Paragraph 35.B *supra* when he went to and saw a certain Dr. Karla Dick, located at 3601 FM 157 in Mansfield.

  A. This physician changed Martin's blood pressure medication.

37. On Monday, October 10, 2022, Martin went back to ProActive.

   A. Martin paid Proactive for the services it had rendered in connection with the DOT physical referenced in Paragraph 35.B *supra.*

   B. Proactive tendered to Martin a multi-page form titled *Medical Examination Report Form (for Commercial Driver Medical Certification)* (hereinafter "Report"), in connection with the DOT physical referenced in Paragraph 35.B *supra.*

   (i) Martin gave a copy of the Report to Guerra at Central Transport on Monday, October 10, 2022.

   (ii) Guerra emailed the Report to "Marnie" in Safety that same day.

   C. Page 4 of the Report states, in part, that Martin "[m]eets standards." Page 4 of the Report also states, in part, that Martin is "required" to go on "periodic monitoring" for a period of "3 months" due to "inadequately controlled HTN [*i.e.*, hypertension]."

38. On or about 12:50 p.m. on Monday, October 17, 2022, Martin texted the following to Guerra – "*Hey[,] have they [i.e., Safety and/or "Marnie"] said anything yet[?]*"

39. On or about 1:49 p.m. on Monday, October 17, 2022, Guerra responded to Martin's text, set forth in Paragraph 38, as follows – "*I have it[.] [D]o you want it in person or via email?*"

40. On or about 2:09 p.m. on Monday, October 17, 2022, Martin replied to Guerra's text, set forth in Paragraph 39, as follows – "*I'll come up there tomorrow about 9[.] [I]s that cool[?]*"

41. Guerra responded promptly to Martin's text, set forth in Paragraph 40, as follows – "*That's cool*[.]"

   A. In this same text, Guerra also writes, ominously, "*[B]ring your equipment too[,] sir.*"

42. Around nine o'clock on the morning of Tuesday, October 18, 2022, Martin showed up at the Irving Terminal and met Guerra face-to-face.

    A. Despite the "[m]eets standards" language in the Report referenced in Paragraph 37.C *supra*, Central Transport, by and through Guerra, informed Martin he had "failed" the DOT exam he had taken, referenced in Paragraph 35.B *supra*.

    B. Despite the "[m]eets standards" language in the Report referenced in Paragraph 37.C *supra*, Central Transport, by and through Guerra, informed Martin that he, Martin, was "out of service."

    C. Despite the "[m]eets standards" language in the Report referenced in Paragraph 37.C *supra*, Central Transport, by and through Guerra, informed Martin that he, Martin, was discharged.

    D. Central Transport, by and through Guerra, tendered to Martin a one-page document titled *Notice of Option to utilize the Employe Termination review Board (ETRB)*, ("Notice"), a true and correct copy of which is attached hereto as **Exhibit A.**

43. Following the events set forth in Paragraph 42 *supra*, Martin left the Irving Terminal and returned to his home.

    A. Martin had **Exhibit A** with him.

    B. Once at his home, but still on Tuesday, October 18, 2022, Martin transmitted an email to Central Transport's Director of Labor Relations, Mr. Dave Kyer.

        (i) Kyer did not respond to this email.

44. On Thursday, October 20, 2022, Martin emailed Kyer again.

    A. In this second email, Martin told Kyer he had been out of work since October 5, 2022.

**Complaint**      **Page 7**

45. Later, but still on Thursday, October 20, 2022, Kyer phoned Martin.

    A. In that phone call, Kyer informed Martin that the "hearing" referenced in **Exhibit A** was scheduled for October 21, 2022, *i.e.*, the following day.

46. On Friday, October 21, 2022, Martin showed up at the Irving Terminal for the "hearing."

    A. About ten minutes after the end of this "hearing," Guerra, on behalf of Central Transport, informed Martin that his, *i.e.*, Martin's, appeal was denied.

47. Central Transport replaced Martin with another driver. This other driver's race is not black.

## *MARTIN'S HARMS AND LOSSES*

48. As a result of Central Transport's conduct, including the foregoing, Martin has sustained financial losses and is continuing to sustain financial losses.

49. As a result of Central Transport's conduct, including the foregoing, Martin has sustained mental anguish and is continuing to sustain mental anguish.

**COUNT ONE:**
**Discrimination in Violation of Section 1981**
**(Racially Hostile Work Environment; No Tangible Job Detriment)**

50. Martin re-alleges and incorporates by reference all allegations set forth in paragraphs 11 through 49.

51. Central Transport discriminated against Martin – specifically, by fostering/tolerating a racially hostile workplace -- in violation of Section 1 of the Civil Rights Act of 1866, codified at 42 U.S.C. §1981 ("Section 1981"), as follows:

    A. Martin belongs to a protected group – namely, his race is black;

    B. Martin was subjected to unwelcome harassment – specifically, two "Dock

Supervisors," neither of whom are black, decided to hang two different nooses, on two separate occasions – the latter of which had a brown-colored dummy – at the Irving Terminal.

      C.    manifestly, the harassment referenced in subparagraph "B" was based on Martin's race (black);

      D.    the harassment referenced in subpart "B" altered a term, condition, or privilege of Martin's employment with Central Transport; and

      E.    Central Transport knew about the two "Dock Supervisors'" conduct; yet, Central Transport failed to take any action that was both (i) prompt and (ii) remedial.

52.    Due to Central Transport's violation of Section 1981, Martin is entitled to recover from Central Transport compensatory damages, past and future.

53.    Due to Central Transport's violation of Section 1981, Martin is entitled to an award of punitive damages from Central Transport because Central Transport engaged in the unlawful employment practices as set forth in this Count One with malice or reckless indifference to Martin's federally protected rights.

54.    Due to Central Transport's violation of Section 1981, Martin seeks to recover from Central Transport his costs, including a reasonable attorney fee and expert fees, if/when he is found to be a "prevailing party."

55.    Due to Central Transport's violation of Section 1981, Martin seeks the maximum prejudgment and post-judgment interest allowed by law.

### COUNT TWO:
### Violation of Section 1981; Discrimination/Discharge

56.    Martin re-alleges and incorporates by reference all allegations set forth in paragraphs 11 through 49.

57. Central Transportation violated Section 1981 because its decision to discharge Martin was motivated, at least in part, by Martin's race (black).

58. Due to Central Transport's violation of Section 1981, Martin seeks all relief that is available to him. This includes but is not limited to the following categories:

    A.    all wages and employment benefits, starting on the effective date of Martin's discharge, and ending on the date when a jury renders a verdict ("back pay").

    B.    reinstatement, or, if that is found to be inappropriate, a sum of money that is equal to all wages and benefits, starting from the date when a jury renders a verdict, and ending on the date when it is determined that Martin will be made whole ("front pay").

    C.    compensatory damages, past and future, for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses.

    D.    punitive damages, given the fact that Central Transport engaged in such discriminatory practices with malice or reckless indifference to Martin's federally protected rights.

    E.    all permitted equitable relief.

    F.    all interest allowed by law, *e.g.,* pre-judgment and post-judgment.

    G.    a reasonable attorney's fee to the undersigned counsel as part of the costs.

    H.    reimbursement of expert fees as part of the undersigned counsel's attorney's fee.

    I.    all other costs allowed by law.

## COUNT THREE:
## Violation of Section 1981; Retaliation/Discharge

59. Martin re-alleges and incorporates by reference all allegations set forth in

paragraphs 11 through 49.

60. Central Transport retaliated against Martin in violation of Section 1 of the Civil Rights Act of 1866, codified at 42 U.S.C. §1981 ("Section 1981"), as follows:

   A. Martin engaged in legally-protected activity – specifically, Martin reported to Central Transport his opposition to the display of one or more nooses at the Irving Terminal, and of Central Transport's inadequate response to those nooses, both of which Martin perceived, reasonably, to be an unlawful employment practice based on race.

   B. Shortly after Martin's legally protected opposition referenced in subpart "A" of this paragraph, Central Transport discharged Martin.

   C. The legally protected activity referenced in subpart "A" of this paragraph, and Central Transport's subsequent discharge of Martin referenced in subpart "B" of this paragraph, are causally linked by various factors – *e.g.,* temporal proximity, and Central Transport's actual knowledge of Martin's legally-protected activity.

61. Due to Central Transport's violation of Section 1981, Martin is entitled to recover from Central Transport an award of back pay and employment benefits, interest on back pay, front pay and future economic benefits, and all other appropriate equitable relief (*e.g.,* reinstatement).

62. Due Central Transport's violation of Section 1981, Martin is entitled to recover from Central Transport compensatory damages, past and future.

63. Martin is also entitled to an award of punitive damages from Central Transport because Central Transport engaged in the retaliatory practices as set forth in this Count Three with malice or reckless indifference to Martin's federally protected rights.

64. Martin seeks to recover from Central Transport his costs, including a reasonable attorney fee and expert fees, if/when he is found to be a "prevailing party."

65. Martin seeks the maximum prejudgment and post-judgment interest allowed by law.

## Jury Demand

66. Martin demands a jury on all issues so triable. *See* FED. R. CIV. P. 38(a).

## Request for Relief

WHEREFORE, Plaintiff Alfred Russell Martin asks that Defendant Central Transport, LLC appear and answer, and that on trial of this action Martin have final judgment against Central Transport, LLC as set forth hereinabove, and for all such other and further relief to which Martin is justly entitled.

Dated: January 15, 2024

        Respectfully submitted,

        */s/ Wade A. Forsman*
By: _____
        **Wade A. Forsman**
        State Bar No. 07264257
        P.O. Box 918
        Sulphur Springs, TX 75483-0918
        903.689.4144 Telephone-East Texas
        972.499.4004 Telephone–Dallas/Fort Worth
        903.689.7001 Facsimile
        wade@forsmanlaw.com

        **Attorney for Plaintiff Alfred Russell Martin**

# Exhibit A



## Notice of Option to utilize the Employee Termination review Board (ETRB)

**To:**
_____

Mr. Martin,

This letter is not a termination notice, it is intended to advise you of your option to appeal your termination via the ETRB process; it is not intended to explain your termination or to deliver the reason or justification for the termination. The reason for termination was explained to you when you were notified and given this letter.  <u>If it is unclear to you why you were terminated, please ask your Terminal Manager or Regional Director of Operations for further explanation.</u>

Please understand this decision was carefully considered and assessed, prior to notifying you. However, if you feel the termination is unjust or has been made without full knowledge of extenuating facts or circumstances, you may appeal the decision to the Employee Termination Review Board (ETRB). The ETRB will consist of at least your manager, the manager's superior or acting Director, and 3 employee relations representatives. Neither the individual nor the involved manager(s) is permitted to have representation by any other individual or counsel. The appeal hearing will be via phone or web conference, or at a location of the ETRB's choosing. The Employee Termination Review Board will examine the case detail and determine appropriateness of corrective action. A representative of the ETRB will advise you of the Employee Termination Review Board's final decision.

>   You have five (5) business days from notice of termination to appeal or refute the facts or level of action imposed. This appeal must be made in writing as a stand-alone notice, providing a full, detailed account of events, facts, and circumstances supporting the reasonable argument *not* to terminate employment. The written appeal must be submitted to the Director of Labor Relations within the same five (5) day period. Failure to comply with the foregoing instructions will result in disqualification from the ETRB process. You may submit your appeal via email to <u>dkyer@centraltransport.com</u> .

Upon termination of employment, the Company will have the Benefits department automatically generate and send a packet to your home, or the most recently known address the Company has on record for you, containing information explaining your company insurance rights, COBRA benefits, and any associated costs. This packet should arrive within one (1) to two (2) weeks after termination of employment.

If you have questions regarding any of the information contained herein, you may contact the Regional Director of Operations or the Director of Labor Relations to assist you.

Dave Kyer
Director of Labor Relations

12225 Stephens Road  Warren, MI 48089
Tel 586-467-0140 ext. 2962
Fax 586-8190-391
dkyer@centraltransport.com
www.centraltransport.com